**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHARLES MOMROW,**

                  **Plaintiff,**

                  v.

**THE COUNTY OF RENSSELAER**
**et al.,**

                  **Defendants.**

**8:15-cv-521**
**(GLS/DJS)**

_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Law Offices of Elmer Robert Keach, III, P.C.<br>One Pine Plaza - Suite 109<br>Albany, NY 12205 | ELMER R. KEACH, III, ESQ.<br>MARIA K. DYSON, ESQ. |
| **FOR THE DEFENDANTS:** | |
| *The County of Rensselaer,*<br>*Jack Mahar, & David Hetman*<br>Carter, Conboy Law Firm<br>20 Corporate Woods Boulevard<br>Albany, NY 12211 | JAMES A. RESILA, ESQ. |
| *Elaine Young*<br>Luibrand Law Firm, PLLC<br>950 New Loudon Road<br>Latham, NY 12110 | KEVIN A. LUIBRAND, ESQ. |
| *Clifford McLean*<br>NO APPEARANCE | |

**Gary L. Sharpe**

**Senior District Judge**

**MEMORANDUM-DECISION AND ORDER**

**I. Introduction**

Plaintiff Charles Momrow commenced this action pursuant to 42 U.S.C. § 1983 against defendants the County of Rensselaer and employees of the County jail including Jack Mahar, the County Sheriff, Elaine Young, the nursing supervisor, David Hetman, a Lieutenant, and Clifford McLean, the maintenance supervisor. (Am. Compl., Dkt. No. 25.) Momrow alleges that defendants violated his right to privacy under the Fourteenth Amendment and that both the County and its supervisors are liable for the alleged unconstitutional conduct.[1] (*Id.*) Pending is a motion to dismiss filed by the County, Sheriff Mahar, and Lieutenant Hetman. (Dkt. No. 6.) For the reasons that follow, the motion is denied.

**II. Background**

---

[1] Momrow does not specify whether the named defendants are sued in their individual or official capacities, however, this is of no moment because defendants are amenable to suit under either theory. *See generally Kentucky v. Graham*, 473 U.S. 159, 166-68 (1985); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978) (holding that "local government officials sued in their official capacities are 'persons' under [42 U.S.C.] § 1983 in those cases in which . . . a local government would be suable in its own name").

2

**A.    Facts**[2]

Between 2007 and 2011, Sheriff Mahar either accessed or directed his subordinate employees to access the personal medical records of County employees or persons who had lawsuits pending before the County. (Am. Compl. ¶ 13.) Individuals were targeted for reasons such as participating in labor unions, supporting Sheriff Mahar's opponent in a past election, applying for New York General Municipal Law § 207(c) benefits, or suing the County. (*Id.*) Additionally, Sheriff Mahar accessed or directed others, including Young and Lieutenant Hetman, to access the medical records of County employees on "sick abuse" status. (*Id.*) In 2004, Sheriff Mahar implemented a policy regarding sick leave. (*Id.* ¶ 12.) County employees who violated the policy were placed on "sick abuse" status and "were denied privileges and/or required to submit a physician's note to explain [their] absence." (*Id.*)

County employees who worked at the County jail medical facility often collaborated with Samaritan Hospital located in Troy, New York. (*Id.* ¶ 9.) The hospital regularly treated County jail inmates. (*Id.*) Additionally,

---

[2] The facts are drawn from Momrow's amended complaint and presented in the light most favorable to him.

the hospital allowed the County's nursing staff to access its electronic medical records to track the care of its inmates. (*Id.*) County nurses were only authorized to access inmate medical records on a computer terminal located at the hospital. (*Id.*) Young signed an agreement consistent with this restricted access. (*Id.* ¶ 10.) As part of the agreement, Young was responsible to secure the password for the computer terminal, which permitted access to medical files of all patients, including non-inmates. (*Id.* ¶ 11.) Young, however, taped the password to her office computer or left it in an easily accessible drawer in her desk. (*Id.*) Because Young failed to secure her password, County nursing staff and correction officers obtained it and accessed restricted medical records. (*Id.*)

In March 2013, Samaritan Hospital notified individuals, including County employees, that their medical records had been improperly accessed by other County employees. (*Id.* ¶ 14.) In response, the County jail launched an internal investigation headed by Lieutenant James Karam. (*Id.* ¶ 15.) In a deposition in a related litigation, Lieutenant Karam testified that the investigation revealed that Sheriff Mahar and Lieutenant Hetman were directly involved in improperly accessing the medical records of County employees. (*Id.*) The investigation also revealed that Young kept

4

the password for the hospital's computer terminal in her locked office, and only she and Lieutenant Hetman had keys to her office. (*Id.*) Young worked the day shift while Lieutenant Hetman regularly worked evening hours when the unauthorized access occurred. (*Id.*) Additionally, the investigation noted that Sheriff Mahar was exclusively responsible for approving sick leave and injury related benefits. (*Id.*)

After the investigation, County employees checked whether their medical records had been wrongfully accessed. (*Id.* ¶ 17.) In January 2014, a County employee learned and informed Momrow that his medical records had been accessed. (*Id.*) Momrow came to learn that his medical records were accessed on January 11, 14, and 21, 2010. (*Id.*) On those same dates, Momrow suffered from a severe psychological breakdown and received treatment for severe depression at Samaritan Hospital. (*Id.*)

In addition, at a deposition in a related litigation, Young admitted that she accessed Momrow's medical records at the direction of Clifford McClean, Momrow's supervisor. (*Id.* ¶ 16.) Young acknowledged that she did not have Momrow's consent to review information including the medication he received and information related to his outpatient psychological treatment, his emergency room care, and his acute medical

5

care.  (*Id.*)  Momrow and McClean did not get along, and Momrow believes McClean maliciously instructed Young to access Momrow's medical records.  (*Id.*)

Furthermore, although Young and Sheriff Mahar knew that County employees were accessing prohibited medical records, they failed to enact policies or training regarding medical privacy.  (*Id.* ¶ 18.)  Sheriff Mahar noted that Young was the supervisor primarily responsible for enacting policies related to the medical department.  (*Id.*)  Sheriff Mahar, Lieutenant Hetman, and Young were responsible for enacting policies and procedures that governed the conduct of County jail employees.  (*Id.* ¶ 29.)

On April 29, 2015, Momrow commenced this action pursuant to 42 U.S.C. § 1983 against the County, Sheriff Mahar, Young, Lieutenant Hetman, and McClean.  (*See generally* Compl., Dkt. No. 1.)  The County, Sheriff Mahar, and Lieutenant Hetman (hereinafter "moving defendants") filed the pending pre-answer motion to dismiss.  (Dkt. No. 6.)  For the reasons that follow, the court denies the motion.

### III. Standard of Review

The standard of review under Fed. R. Civ. P. 12(b)(6) is well established and will not be repeated here.  For a full discussion of the

6

standard, the court refers the parties to its prior opinion in *Ellis v. Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010), *abrogated on other grounds by Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191 (2d Cir. 2015).

## IV. Discussion

Moving defendants argue that Momrow fails to state a claim for two reasons. (Dkt. No. 6, Attach. 1 at 4-7.) First, they contend that Momrow failed to allege that his medical information was publicly disclosed. (*Id.* at 4-5.) Second, they assert that severe depression is not a medical condition which warrants constitutional protection. (*Id.* at 5-7.) Momrow opposes and contends that public dissemination is not a requirement of his Fourteenth Amendment right to privacy claim. (Dkt. No. 13 at 8-10.) Additionally, Momrow stresses that mental health diagnoses, including severe depression, have the requisite severity and social stigma to be constitutionally protected. (*Id.* at 10-11.) The court decidedly agrees with Momrow.

The Due Process Clause of the Fourteenth Amendment protects against state intrusion of a person's liberty including fundamental personal rights "'implicit in the concept of ordered liberty'" such as the right to

7

privacy. *Roe v. Wade*, 410 U.S. 113, 152 (1973) (quoting *Palko v. Connecticut*, 302 U.S. 319 (1937)); *see* U.S. Const. amend. XIV § 1. This guarantee of privacy extends to an individual's interest in avoiding the disclosure of certain personal matters. *See Whalen v. Roe*, 429 U.S. 589, 599-600 (1977). Courts have identified this right as "a right to 'confidentiality,' to distinguish it from the right to autonomy and independence in decision-making." *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994). Confidentiality in one's medical information was subsequently recognized as constitutionally protected because "'[i]nformation about one's body and state of health is [a] matter which the individual is ordinarily entitled to retain within the private enclave where he may lead a private life.'" *Id.* (quoting *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980)). Courts have routinely applied intermediate scrutiny to evaluate the government's intrusion into disclosing protected medical information. *See id.* at 269-70; *O'Connor v. Pierson*, 426 F.3d 187, 202-03 (2d Cir. 2005).

Whether an individual has a constitutionally protected privacy interest in his particular medical information will vary with his condition. *See Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 64-65 (2d

Cir. 2011) (explaining that "[a] general medical determination or acknowledgment that a disease is serious does not give rise *ipso facto* to a constitutionally-protected privacy right"); *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999). The particular medical condition must be both serious and "likely to bring about public opprobrium." *Matson*, 631 F.3d at 66. Accordingly, courts "have . . . focused [their] constitutional analysis on whether revealing one's condition would expose a person not to understanding or compassion but to *discrimination* and *intolerance*." *Id.* at 67 (internal quotation marks and citation omitted).

Diseases litigated thus far at the Second Circuit revealed obvious results. *See Matson*, 631 F.3d at 67-69 (holding fibromyalgia is not constitutionally protected); *O'Connor*, 426 F.3d at 201 ("[The court] easily h[e]ld that [the plaintiff] had a protected privacy right in the medical records [containing the results of a psychiatric exam]."); *Powell*, 175 F.3d at 111-12 (holding a prisoner had the right to confidentiality in his transsexualism and HIV-positive status); *Doe*, 15 F.3d at 267 (finding a plaintiff had a right to confidentiality in his HIV status). The court anticipates that this inquiry will become increasingly demanding as attorneys litigate whether constitutional protection attaches to a particular disease in any given case. As may

9

become apparent in this district, the outcomes for plaintiffs alleging the very same conduct may vacillate based on their particular medical condition. *See generally Hancock v. Cty. of Rensselaer*, No. 13-cv-1184; *Karam v. Cty. of Rensselaer*, No. 13-cv-1018; *Snyder v. Cty. of Rensselaer*, No. 14-cv-242; *Pasinella v. Cty. of Rensselaer*, No. 13-cv-607.

That said, serious depression and other psychiatric conditions undoubtedly qualify for constitutional protection. *See O'Connor*, 426 F.3d at 201. To be sure, "[m]edical information in general, and information about a person's psychiatric health . . . in particular, is information of the most intimate kind."[3] *Id.* The court does not pretend to have medical expertise as "[l]ay people are not qualified to determine other people's medical fitness" and "psychiatry [is] a discipline that can be practiced only by professionals." *Id.* at 202. Therefore, the court will consider what the

---

[3] Moving defendants assert that "*O'Connor* is no longer the proper authority in the Second Department [sic]" and contend that *Matson*, while "not expressly overrul[ing] *O'Connor*," modified its holding that "'protect[ed] all medical conditions from disclosure.'" (Dkt. No. 15 at 4-5 (quoting *Matson*, 631 F.3d at 65).) Moving defendants' argument is misguided. Nowhere in *O'Connor* does the Second Circuit hold that all medical conditions are constitutionally protected. *O'Connor* only determined that the plaintiff had a protected privacy right in the results of his psychiatric exam. *See* 426 F.3d at 201-02. The *Matson* court recited the plaintiff's interpretation of *O'Connor*, but swiftly "reject[ed] [plaintiff's] reading." *Matson*, 631 F.3d at 65. Consequently, this court rejects moving defendants' assertion that *O'Connor* is bad law.

experts say.

Depression is a mood disorder that causes severe symptoms lasting at minimum two weeks, which impacts a person's outlook and daily activities including sleep, diet, and work.  *See* Depression, Nat'l Inst. of Mental Health, https://www.nimh.nih.gov/health/topics/depression/index.shtml (last visited Mar. 24, 2016).  Signs of depression include, but are not limited to, persistent sadness and anxiety, loss of interest in hobbies and activities, decreased energy, appetite and weight changes, difficulty concentrating and making decisions, and suicidal thoughts or attempts.  *See id.*

Although 15.7 million adults living in the United States in 2014, or 6.7 percent, had at least one major depressive episode within the previous year, *see* Major Depression Among Adults, Nat'l Inst. of Mental Health, https://www.nimh.nih.gov/health/statistics/prevalence/major-depression-among-adults.shtml (last visited Mar. 24, 2016), social stigma persists.  One study reported that twenty-one percent of respondents agreed that "[a]nyone with a history of mental problems should be excluded from taking public office," and that "[a]s soon as a person shows signs of mental

disturbance, he should be hospitalized."[4]  Health & Social Care Info. Ctr., Survey Report — Attitude to Mental Illness 9 (2011), www.hscic.gov.uk/catalogue/PUB00292/atti-ment-illn-sur-rep.pdf (last visited Mar. 24, 2016).  Eighty-five percent of respondents agreed that people with mental illness experience stigma and discrimination.  *See id.* at 29.  It is no surprise that forty-three percent of respondents reported that they would feel uncomfortable talking to their employer about their mental health.  *See id.* at 5, 28-29.

In light of this research and well-documented statistics, the court is surprised by moving defendants' position that "depression does not carry *any* sort of social stigma or result in discrimination in our society." (Dkt. No. 6, Attach. 1 at 7 (emphasis added).)  This argument is offensive to the nearly forty-four million American adults who suffer from mental illness.  *See* Any Mental Illness Among U.S. Adults, Nat'l Inst. of Mental Health,

---

[4]  The court understands that mental illness encompasses conditions such as depression, bipolar disorder, schizophrenia, and anxiety disorders.  *See* Mental Health Facts in America, Nat'l All. on Mental Illness, https://www.nami.org/NAMI/media/NAMI-Media/Infographics/GeneralMHFacts.pdf (last visited Mar. 22, 2016).  Additionally, the court acknowledges that the severity of such conditions exist on a continuum.  *See* Joan Bibelhausen et al., *Reducing the Stigma: The Deadly Effect of Untreated Mental Illness & New Strategies for Changing Outcomes in Law Students*, 41 Wm. Mitchell L. Rev. 918, 920 (2015).  Research, however, suggests that the stigma associated with mental illness is shared by all types of diagnoses.  *See id.* at 920-26.

www.nimh.nih.gov/health/statistics/prevalence/any-mental-illness-ami-among-us-adults.shtml (last visited Mar. 24, 2016). What is more, moving defendants latch onto *dicta* in *Matson* and argue there is no social stigma associated with depression because pharmaceutical companies regularly advertise antidepressants. (Dkt. No. 6, Attach. 1 at 6-7 (citing *Matson*, 631 F.3d at 67-68).) Moving defendants' position is undercut by the dissent in *Matson,* which found the majority's allusion to the significance of advertisements "puzzling." *Id.* at 74 (Straub, J., dissenting). In other words, the dissent deplores the majority's failure to explain "how the fact of televised advertisements for a drug treatment bears on the issue of whether a condition is highly personal or carries a social stigma." *Id.* at 74, 74 n.5 (explaining that genital herpes would likely meet the majority's standard for constitutional protection, but pharmacological treatment is regularly advertised). This court, like the *Matson* dissent, is unpersuaded by the majority's *dicta* and finds the existence of advertisements irrelevant to the inquiry regarding social stigma.

Moving defendants also contend that Momrow's claim must fail because he has not alleged that his confidential medical information entered "the public sphere." (Dkt. No. 6, Attach. 1 at 4.) As Momrow

13

points out, this is not a requirement of the Fourteenth Amendment claim. (Dkt. No. 13 at 8-10.) Unauthorized access and disclosure to other employees will suffice. *See Powell*, 175 F.2d at 112; *Makas v. Miraglia*, No. 05 Civ. 7180, 2007 WL 152092, at *9-10 (S.D.N.Y. Jan. 23, 2007), *report & recommendation adopted by* 2007 WL 724603 (S.D.N.Y. Mar. 5, 2007), *aff'd in relevant part*, 300 F. App'x 9 (2d Cir. 2008).

In contrast to the lionshare of Second Circuit cases on this issue, Momrow challenges executive rather than legislative action. (*See generally* Am. Compl.) "To prevail when challenging executive action that infringes a protected right, a plaintiff must show not just that the action was literally arbitrary, but that it was 'arbitrary in the constitutional sense.'" *O'Connor*, 426 F.3d at 203 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)). As such, "[m]ere irrationality is not enough: 'only the most egregious official conduct,' conduct that 'shocks the conscience,' will subject the government to liability for a substantive due process violation based on executive action." *Id.* (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Although "[t]he shocks-the-conscience test is necessarily imprecise," the standard requires an inquiry into "the state of mind of the government actor and the context in which the action

14

was taken." *Id.*

Momrow pleads that Sheriff Mahar personally accessed or directed others to access his medical records without authorization and in violation of the hospital's policy. (Am. Compl. ¶ 13.) Momrow alleges that he was intentionally targeted by Sheriff Mahar and his subordinates because he was placed on sick abuse status. (*Id.*) These allegations sufficiently state a claim that the County's conduct shocked the conscience, and Momrow sufficiently pleads the state of mind of Sheriff Mahar, Lieutenant Hetman, and Young. *See O'Connor*, 426 F.3d at 203.

Additionally, the moving defendants dispute Momrow's *Monell* and supervisory liability claims. (Dkt. No. 6, Attach. 1 at 10-12.) Because Momrow alleges direct personal involvement in unconstitutional conduct of the County's final policymakers, he necessarily states a claim for both County and supervisory liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978); *Colon v. Couglin*, 58 F.3d 865, 873 (2d Cir. 1995). Finally, moving defendants oppose Momrow's request prayer for punitive damages. (Dkt. No. 6, Attach. 1 at 12.) It is, however, premature to discuss the availability of these damages on a motion to dismiss. The court has also considered and rejected the moving defendants' remaining

arguments. (Dkt. No. 6, Attach. 1 at 7-10.)

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the moving defendants' motion to dismiss (Dkt. No. 6) is **DENIED**; and it is further

**ORDERED** that the parties contact Magistrate Judge Daniel Stewart to schedule further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

March 30, 2016
Albany, New York

*Gary L. Sharpe*
Gary L. Sharpe
U.S. District Judge